**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**In the**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 14-1088**

---

**SINCLAIR BROADCAST GROUP, INC.,**

*Petitioner*,

v.

**FEDERAL COMMUNICATIONS COMMISSION AND**
**UNITED STATES OF AMERICA,**

*Respondents*.

---

**On Petition for Review of a Report and Order of the**
**Federal Communications Commission**

---

**BRIEF FOR PETITIONER**

---

Clifford M. Harrington
Jay E. Silberg
John K. Hane
Paul A. Cicelski
Thomas G. Allen
(202) 663 8000
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
2300 N Street, N.W.
Washington, D.C.  20037-1128

**Attorneys for Sinclair Broadcast Group, Inc.**

September 16, 2014

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel for

Petitioner, Sinclair Broadcast Group, Inc., hereby submit this certificate of counsel

as to the parties, rulings and related cases:

### A.  **Parties and Amici**

1.  Parties and Intervenors

The following are all persons who are parties and intervenors in the

consolidated cases in this Court:

- Sinclair Broadcast Group, Inc.;
- Federal Communications Commission;
- United States of America;
- The National Association of Broadcasters.

### B.  **Rulings under Review**

Petitioners seek review of the FCC's *Report and Order In the Matter of*

*Amendment of the Commission's Rules Related to Retransmission Consent*, FCC

Docket No. 10-71, 29 FCC Rcd 3351 (2014) (J.A. ___) .

### C.  **Related Cases**

The case on review has not previously been before this Court or any other

court.  A related case can be found at *Howard Stirk Holdings, LLC (Petitioner) v.*

*Federal Communications Commission and United States of America*

*(Respondents)*, 14-1090 (and consolidated cases) which remains pending before

this Court.  In that Case Petitioner is seeking review of an FCC Order regarding the

FCC's 2010 Quadrennial Regulatory Review.  The pending proceeding involves

Joint Sales Agreements among television broadcast stations and the FCC's

ownership rules and therefore the Case is related to the instant proceeding.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and District of Columbia Circuit Rule 26.1, Sinclair Broadcast Group, Inc. ("Sinclair") hereby submits the following disclosure statement:

Sinclair is a Maryland corporation that is publicly traded on the NASDAQ Stock Exchange [NASDAQ: SBGI].  Sinclair operates and provides programming and sales services to television stations in various cities across the country. Sinclair has no parent company and no publicly traded company owns more than 10% of Sinclair's stock.

iv

# TABLE OF CONTENTS

Page

STATEMENT OF JURISDICTION.................................................................1

STATUTES AND REGULATIONS..............................................................1

STATEMENT OF THE ISSUES...................................................................2

STATEMENT OF THE CASE........................................................................2

STATEMENT OF THE FACTS ....................................................................3

SUMMARY OF ARGUMENT ....................................................................14

STANDING ...................................................................................................19

ARGUMENT .................................................................................................20

I.   THE FCC LACKS AUTHORITY TO ADOPT THE ORDER. ........................20

    A. The FCC Does Not Have Authority to Try to Affect the
       Substantive Terms of Retransmission Agreements ......................................23

       1. Section 325(b)(3)(A) Gives the FCC Only Narrow Authority
          to Establish Rules for Broadcasters to Choose Between Must
          Carry and Retransmission Consent ...........................................26

       2. Section 325(b)(3)(C)(ii) Gives the FCC Authority Only to
          Ensure that the Broadcasters Come to the Bargaining Table
          with a Good Faith Intent to Negotiate and Not Discriminate
          Unreasonably Between Cable and Satellite MVPDs ...............................29

    C. The Commission Has No Authority to Impose a Limitation on
       Broadcasters Only......................................................................31

    D. The FCC Does Not Have Authority to Limit Broadcasters'
       Freedom to Alienate their Retransmission Rights.......................................34

II. THE RULE THAT JOINT NEGOTIATION IS *PER SE* BAD FAITH IS
    ARBITRARY AND CAPRICIOUS.................................................................35

A. It is Arbitrary and Capricious to Adopt a *Per Se* Standard When No Broadcaster Has Ever Been Found To Have Negotiated In Bad Faith ................................................................................. 37

B. It is Arbitrary and Capricious for the FCC to Rely on Antitrust Law to Conclude that Joint Negotiations are *Per Se* Violations of the Good Faith Bargaining Obligation When They Are Not *Per Se* Illegal Under Antitrust Law ............................................... 38

C. The FCC's Conclusion that Joint Negotiations Leads to Supra-Competitive Prices is Unsupported by the Record and Ignores Evidence that Undermines Its Conclusion ................................... 43

D. It is Arbitrary and Capricious for the FCC to Abandon Its Prior Determinations Regarding the Scope of Its Authority ............................... 51

CONCLUSION AND RELIEF REQUESTED ...................................... 56

vi

# TABLE OF AUTHORITIES[*]

## CASES

*Action for Children's Television v. FCC,*
  821 F.2d 741 (D.C. Cir. 1987) ..................................................................62

*AFGE, AFL-CIO, Local 3669 v. Shinseki,*
  709 F.3d 29 (D.C. Cir. 2013) ...................................................................26

*Am. Library Ass'n. v. FCC,*
  406 F.3d 689 (D.C. Cir. 2005) ........................................................... 24, 25

*AT&T Inc. v. FCC,*
  452 F.3d 830 (D.C. Cir. 2006) ........................................................... 25, 41

*BNSF Ry. Co. v. Surface Transp. Bd.,*
  741 F.3d 163 (D.C. Cir. 2014) ..................................................................42

*Bragdon v. Abbott,*
  524 U.S. 624 (1998) ...................................................................................38

*Broad. Music, Inc. v. CBS, Inc.,*
  441 U.S. 1 (1979) ............................................................................... 45, 49

*Business Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011) ................................................................42

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ............................................................. 25, 26, 27, 34

*Circuit City Stores v. Adams,*
  532 U.S. 105 (2001) ...................................................................................35

*Comcast Corp. v. FCC,*
  579 F.3d 1 (D.C. Cir. 2009) ......................................................................41

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n,*
  673 F.2d 525 (D.C. Cir. 1982) ........................................................... 63, 64

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
  433 U.S. 36 (1977) .....................................................................................46

*Emily's List v. FEC,*
  581 F.3d 1 (D.C. Cir. 2009) ......................................................................26

*FCC v. Fox TV Stations, Inc.,*
  556 U.S. 502 (U.S. 2009) ..........................................................................60

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

vii

*Fortnightly Corp. v. United Artists Television, Inc.,*
  392 U.S. 390 (1968) ................................................................5

*Fox Television Stations, Inc. v. FCC,*
  280 F.3d 1027 (D.C. Cir. 2002) .........................................56

*Greater Boston Television Corp. v. FCC,*
  444 F.2d 841 (D.C. Cir. 1970) ...........................................62

*Indiana Boxcar Corp. v. RRB,*
  712 F.3d 590 (D.C. Cir. 2013) ...........................................42

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355, 106 S.Ct. 1890 L.Ed.2d 369 (1986) ..........25

*Lorillard v. Pons,*
  434 U.S. 575 (1978) ............................................................38

*MCI Telecomm'ns Corp. v. FCC,*
  57 F.3d 1136 (D.C. Cir. 1995) ...........................................64

*Motion Picture Ass'n of Am., Inc. v. FCC,*
  309 F.3d 796 (D.C. Cir. 2002) ...........................................27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (U.S. 1983) ......................................................41

*Portland Cement Ass'n v. EPA,*
  665 F.3d 177 (D.C. Cir. 2011) ...........................................43

*Rapoport v. SEC,*
  682 F.3d 98 (D.C. Cir. 2012) .............................................42

*Ry. Labor Executives Ass'n v. Nat'l Mediation Bd.,*
  29 F.3d 655 (D.C. Cir. 1994) (*en banc*) ...........................26

*Sierra Club v. EPA,*
  *292 F.3d 895 (D.C. Cir. 2002)* .........................................23

*Sinclair Broad. Grp., Inc. v. FCC*
  284 F.3d 148 (D. C. Cir. 2002) ............................... 18, 56, 57

*Teleprompter Corp. v. Columbia Broad. Sys, Inc.,*
  415 U.S. 394 (1974) ..............................................................5

*Texaco, Inc. vs. Dagher,*
  547 U.S. 1 (2006) ................................................................46

*United States v. Baker Hughes, Inc.,*
  908 F.2d 981 (D.C. Cir. 1990) ...........................................48

*US v. Tex. Television, Inc.*
  Civil Action No. C-96-64, 1996 WL 859988 (S.D. Tex. Feb. 15 1996) ...... 49, 50

viii

*Verizon Telephone Cos. v. FCC*,
  570 F.3d 294 (D.C. Cir. 2009) ...................................................................63

*Weaver's Cove Energy, LLC v. Rhode Island Dep't of Envtl. Mgmt.*,
  524 F.3d 1330 (D.C. Cir. 2008) .................................................................23

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...................................................................................34

## STATUTES AND CODES

Cable Television Consumer Protection and Competition Act of 1992, Pub.
  L. No. 102-385, 106 Stat. 1460 (1992) ........................ 6, 7, 28, 29, 31, 32, 34, 36

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-
  435, 90 Stat. 1383 (1976) ..................................................... 15, 16, 49

Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub.
  L. No. 108-447, § 207, 118 Stat. 2809, 3393 (2004) ................... 9, 19, 28, 37, 38

Satellite Home Viewer Improvement Act, Pub. L. No. 106-113, 113 Stat.
  1501, 1501A-537, Appendix I (1999) ................................... 8, 9, 28, 29

Telecommunications Act of 1996,
  Section 202(h) ....................................................................... 56, 57

United States Code
  Title 5 Section 706(2)(A) ....................................................... 20, 40, 41
  Title 5 Section 706(2)(C) ...................................................................24
  Title 27 Section 325(b)(3)(B) ................................................... 32, 33
  Title 28 Section 2342 (2012) ...................................................................1
  Title 47 Section 325 ...................................................................7
  Title 47 Section 325(b)(1)(A) ...................................................................3
  Title 47 Section 325(b)(3)(A) ........................................ 4, 7, 31, 33
  Title 47 Section 325(b)(3)(C) ...................................................................4
  Title 47 Section 325(b)(3)(C)(ii) ........................................ 7, 20, 34, 35
  Title 47 Section 402(a) (2012) ...................................................................1
  Title 47 Section 534 ...................................................................7

## RULES AND REGULATIONS

79 Federal Register 28615 (May 19, 2014) ........................................1, 4

Code of Federal Regulations
  Title 47 Section 76.65(b) ...................................................................11
  Title 47 Section 76.65(b)(1)(viii)(B)(1) ...................................... 16, 39

ix

## OTHER AUTHORITIES

*Collaboration Guidelines*.............................................................................42

Federal Trade Commission and U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (April 2000) § 1.2....... 40, 41

*Media Ownership:  FCC Should Review the Effects of Broadcaster Agreements on Its Media Policy Goals*, GAO-14-558 (June 2014)....... 42, 50, 51

U.S. Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* (2010).....................................................................41

x

# GLOSSARY

| | |
|---|---|
| ***1992 Cable Act*** | Cable Television Consumer Protection and Competition Act of 1992, Pub L. No. 102-385, 106 Stat. 1460 (1992) |
| ***1993 Implementation Order*** | Must Carry and Retransmission Consent Requirements, 8 FCC Rcd 2965 (1993) |
| ***APA*** | Administrative Procedure Act |
| ***Commission*** | Federal Communications Commission |
| ***DBS*** | Direct Broadcast Satellite |
| ***DOJ*** | Department of Justice |
| ***FCC*** | Federal Communications Commission |
| ***Good Faith Order*** | In the Matter of Implementation of the Satellite Home Viewer Improvement Act of 1999, 15 FCC Rcd 5445, (2000) |
| ***MVPD*** | Multichannel Video Programming Provider |
| ***Petition*** | Time Warner Cable Inc. *et al.* Petition for Rulemaking to Amend the Commission's Rules Governing Retransmission Consent, MB Docket No. 10-71 (filed Mar. 9, 2010) |
| ***Retransmission NPRM*** | *In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent,* Notice of Proposed Rulemaking, 26 FCC Rcd 2718 (2011) |
| ***Retransmission Order*** | *In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*, 29 FCC Rcd 3351 (2014) |
| ***Section 202(h)*** | Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56 (1996) |

| | |
|---|---|
| ***Section 325*** | 47 U.S.C. § 325 |
| ***SHVERA*** | The Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447, § 207, 118 Stat 2809 (2004) (codified at 47 U.S.C. § 325) |
| ***SHVIA*** | Title I of the Intellectual Property and Communications Omnibus Reform Act of 1999 (relating to copyright licensing and carriage of broadcast signals by satellite carriers, codified in scattered sections of 17 and 47 U.S.C.), PL 106-113, 113 Stat. 1501, Appendix I (1999) |
| ***Telecommunications Act of 1996*** | Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) |

404778345_1.DOCX

## STATEMENT OF JURISDICTION

On May 29, 2014, Sinclair timely filed a petition for review of the Report and Order of the Federal Communications Commission (the "FCC" or "Commission"), released March 31, 2014. *In the Matter of Amendment of the Commission's Rules Related to Retransmission Consent*, FCC Docket 10-71, 29 FCC Rcd 3351 (2014) ("*Retransmission Order*") (J.A. ___). The *Retransmission Order* is a final order that became effective June 18, 2014, pursuant to publication in the Federal Register on May 19, 2014. *See* 79 Fed. Reg. 28615 (May 19, 2014) (J.A. ___).

This Court has jurisdiction over Sinclair's appeal pursuant to Section 402(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 402(a) (2012) and 28 U.S.C. § 2342 (2012). Sinclair's intention to seek review of the Retransmission Order is inferable from, *inter alia,* the Statement of Issues Sinclair filed on March 31, 2014.

## STATUTES AND REGULATIONS

The relevant statutes and regulations appear in the Addendum to this brief.

404778345_1.DOCX

## STATEMENT OF THE ISSUES

1.  Whether the FCC's new rule prohibiting joint negotiations with cable and satellite operators by certain television broadcast stations exceeds the FCC's statutory authority under the Communications Act of 1934, as amended and the 1992 Cable Act.

2.  Whether the FCC's new rule is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence and otherwise contrary to law.

## STATEMENT OF THE CASE

The revenue that broadcasters collect from cable and satellite companies that provide subscription television service ("MVPDs") is vital to the continued viability of local television broadcasting. Congress established broadcasters' right to negotiate for these "retransmission consent" fees in 1992, and later required both broadcasters and MVPDs to negotiate retransmission rights "in good faith". *See* 47 U.S.C. §§ 325(b)(1)(A), 325(b)(3)(A) and 325(b)(3)(C). At issue is a new rule which prohibits, as a *per se* violation of the statutory obligation of negotiating in good faith, joint negotiations by any two television broadcast stations that are ranked among the top four stations in the same geographic market if they

2

are not commonly owned, operated or controlled.  *See generally*

*Retransmission Order* (J.A. ___).  The new rule was adopted in the FCC's

*Retransmission Order* and became effective June 18, 2014, pursuant to

publication in the Federal Register on May 19, 2014.  *See* Retransmission

Consent Negotiations, 79 Fed. Reg. 28615 (May 19, 2014) (J.A. ___).

Sinclair filed public comments in the agency proceedings below on May 27,

2011.  *See* Comments of Sinclair Broadcast Group, Inc., MB Docket No. 10-

71 (filed May 27, 2011) (J.A. ___).

    The Commission's actions exceeded its statutory authority, were

arbitrary and capricious, lack any rational foundation in the record, and

should therefore be vacated by this Court.

## STATEMENT OF THE FACTS

    MVPDs retransmit the signals of television broadcast stations.  For

decades, cable systems were able to do this without asking permission from

television stations and without making any payment to them.  *See*

*Teleprompter Corp. v. Columbia Broad. Sys, Inc.*, 415 U.S. 394 (1974),

*superseded by statute*, Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat.

2541 (codified as amended in 17 U.S.C.), *as recognized in ABC, Inc. v.*

*Aereo, Inc.*, 134 S. Ct. 2498 (2014); *Fortnightly Corp. v. United Artists*

*Television, Inc.,* 392 U.S. 390 (1968), *superseded by statute*, Copyright Act

3

of 1976, Pub. L. No. 94-553, 90 Stat. 2541 (codified as amended in 17

U.S.C.), *as recognized in ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014).

*See also* Comments of LIN Television Corporation d/b/a LIN Media, MB

Docket No. 10-71, at 23 (filed June 26, 2014) (J.A. ___).

     Through a series of statutes, beginning in 1992, Congress established

a fundamentally different regime.  By far the most significant change, the

1992 Cable Act[1], was the first of these statutes.  The 1992 Cable Act gave

broadcasters the right to control retransmission of their signals by MVPDs.

Congress adopted the 1992 Cable Act to eliminate the "system under which

broadcasters in effect subsidize[d] the establishment of their chief

competitors," which threatened the ongoing viability of television

broadcasting.  *See* S. Rep. 102-92 at 35 (1991) (J.A. ___).

     The 1992 Cable Act required broadcasters to choose, once every three

years, between "must carry" and "retransmission consent."  106 Stat. at

1482-83 (J.A. ___); 47 U.S.C. § 325.  MVPDs are generally required to

include "must carry" stations in their lineups on specific terms Congress

established, without negotiation between the parties.  106 Stat. at 1471 (J.A.

---

[1] Cable Television Consumer Protection and Competition Act of 1992, Pub.
L. No. 102-385, 106 Stat. 1460 (1992) (J.A. ___) ("1992 Cable Act") (J.A.
___).

4

___); 47 U.S.C. § 534.  Stations that choose "retransmission consent" have

the right to negotiate terms of carriage, including payment by the MVPD for

the right to carry the station's programming.  47 U.S.C. § 325(b)(3)(C)(ii).

Congress instructed the FCC to adopt rules to govern the process through

which broadcasters make their triennial carriage elections.  Section

325(b)(3)(A) provides that:

> the Commission shall . . . establish regulations to govern the
> exercise by television broadcast stations of the right to grant
> retransmission consent under this subsection and of the right to
> [must carry] signal carriage. . . .

47 U.S.C. § 325(b)(3)(A).

In implementing the 1992 Cable Act, the FCC acknowledged

Congress' intent that the FCC should not interfere with the substance of

retransmission consent negotiations and that retransmission rights should be

freely alienable by broadcasters, including to parties other than MVPDs.  *See*

*Must Carry and Retransmission Consent Requirements*, 8 FCC Rcd 2965, ¶

173 (1993) ("*1993 Implementation Order*") (J.A. ___) (noting the broad

scope of the broadcasters' ability to negotiate retransmission consent and

that the right "may be bargained away by broadcasters" to third parties);  *In*

*the Matter of Implementation of the Satellite Home Viewer Improvement Act*

*of 1999*, 15 FCC Rcd 5445, ¶ 6 (2000) ("*Good Faith Order*") (J.A. ___)

("the statute does not intend to subject retransmission consent negotiation to

detailed substantive oversight by the Commission").

By 1999, satellite television ("DBS") had emerged as a competitor to cable and wanted the same rights to retransmit local stations. *Good Faith Order* at ¶ 5 (J.A. ___) (describing changes affecting "the satellite industry and subscribers"). Congress responded by extending a similar must carry/retransmission consent regime to satellite providers. *See* Satellite Home Viewer Improvement Act, Pub. L. No. 106-113, 113 Stat. 1501, 1501A-537, Appendix I (1999) ("SHVIA") (J.A. ___). It also prohibited exclusive carriage agreements and directed the FCC to revise its regulations to require broadcasters to negotiate in good faith with all MVPDs. *Id.* at 1501A-538 (J.A. ___). Specifically, Congress directed the FCC to:

> . . . prohibit a television broadcast station that provides retransmission consent from . . . failing to negotiate in good faith, and it shall not be a failure to negotiate in good faith if the television broadcast station enters into retransmission consent agreements containing different terms and conditions, including price terms, with different multichannel video programming distributors if such different terms and conditions are based on competitive marketplace considerations.

*Id.* (codified at 47 U.S.C §325(b)(3)(C)(ii)) (J.A. ___).

In 2004, Congress used identical language to extend the good faith bargaining obligation to MVPDs. *See* Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447, § 207, 118 Stat. 2809, 3393 (2004) (codified at 47 U.S.C. § 325) ("SHVERA") (J.A. ___).

6

Reviewing a lengthy record, the FCC made clear that Congress did not

authorize it to "subject retransmission consent negotiation to detailed

substantive oversight by the Commission … Congress intended that the

Commission follow established precedent, particularly in the field of labor

law, in implementing the good faith retransmission consent requirement."

*Good Faith Order* at ¶ 6 (J.A. ___).  The FCC concluded that Congress "did

not intend that the Commission should intrude in the negotiation of

retransmission consent … [or authorize] the Commission [to] assume a

substantive role in the negotiation of the terms and conditions of

retransmission consent." *Id.* at ¶ 14 (J.A. ___).  The FCC determined that

established precedent regarding statutory construction required the

Commission's authority to be "narrowly construed," *Id.* at ¶ 20 (J.A. ___),

and that Congress intended for the Commission only to "develop and

enforce a process that ensures that broadcasters and MVPDs meet to

negotiate retransmission consent and that such negotiations are conducted in

an atmosphere of honesty, purpose and clarity of process." *Id.* at ¶ 24 (J.A.

___).  The FCC further stated that "the good faith negotiation requirement

applies solely to the process of the negotiations." *Id.* at ¶ 22 (emphasis

added) (J.A. ___).

     The FCC also established a good faith bargaining dispute resolution

7

procedure to assess complaints under a simple two-part test. *Id.* at ¶ 6 (J.A. ___). The first part consists of a concise list of seven *per se* negotiation standards to determine whether a party has met itsr obligation to negotiate in good faith. *Id.* (J.A. ___). The second part provided that the Commission may look at the "totality of the circumstances" to consider whether a party failed to negotiate retransmission consent in good faith even if the seven objective standards were met. *Id.* at ¶ 7 (J.A. ___).

The Commission recognized that *per se* standards, "of necessity . . . must be concise, clear and constitute a violation of the good faith standard in all possible instances." *Id.* at ¶ 31 (J.A. ___). Accordingly, the objective standards addressed simple matters of process, such as providing that a party "may not refuse to negotiate with" another party, "may not put forth a single, unilateral proposal" and "must provide considered reasons for rejecting any aspects of the [other party's] offer." *Id.* at ¶ 6 (J.A. ___); *see also* 47 C.F.R. § 76.65(b).

The good faith rules have been in place for many years. Yet the notice of proposed rulemaking in the proceeding that led to adoption of the rule observed that "[t]here have been very few complaints filed alleging violations of those rules." *See Amendment of the Commission's Rules Related to Retransmission Consent,* Notice of Proposed Rulemaking, 26

8

FCC Rcd 2718, ¶ 12 (2011) ("*Retransmission NPRM*") (J.A. ___).

Although there have been thousands of retransmission consent negotiations,

the record in the proceedings below reflects only four complaints that were

adjudicated by the FCC, all of which occurred between 2001 and 2009. *Id.*

(J.A. ___). Three of the four decisions rejected complaints alleging

broadcasters had failed to negotiate in good faith. *Id.* (J.A. ___). The

fourth found that a cable operator, and not a television broadcaster, had

violated the good faith bargaining obligation. *Id.* (J.A. ___).

Consequently, in the fourteen years the good faith rules have been in

place, no broadcaster has ever been found to have violated its obligation to

negotiate in good faith on any grounds. *Id.* (J.A. ___).

In 2010, a group of MVPDs filed a Petition for Rulemaking with the

FCC asking the FCC to fundamentally change its retransmission consent

rules.[2] The Petition argued that increasing retransmission fees and signal

"blackouts" during carriage negotiation "impasses" were harming

consumers.[3] The Petition asked the FCC to take several actions to regulate

broadcasters' retransmission rights and claimed several bases of statutory

---

[2] Time Warner Cable Inc. *et al.* Petition for Rulemaking to Amend the
Commission's Rules Governing Retransmission Consent, MB Docket No.
10-71 (filed Mar. 9, 2010) (J.A. ___) (the "*Petition*").

[3] *Id.* at 13 (J.A. ___).

authority, including (but not limited to) use of the good faith rules to impose

substantive restrictions on broadcasters.[4]

In 2011, the FCC responded to the Petition by initiating a rulemaking

proceeding to consider several limitations on broadcasters' retransmission

consent rights.  *See generally Retransmission NPRM* (J.A. ___).  The stated

goal of the proceeding was "to protect consumers from the disruptive impact

of the loss of broadcast programming carried on" MVPDs.  *Id.* at ¶ 17 (J.A.

___).  The FCC sought "to better utilize the good faith requirement as a

consumer protection tool."  *Id.*  (J.A. ___).  The *Retransmission Order* arose

from that proceeding.

In their *Petition*, and in subsequent comments and *ex parte* filings, the

MVPDs argued that broadcasters have too much leverage in retransmission

negotiations.  *See, e.g.*, *Petition* at 15 (J.A. ___); Reply Comments of Time

Warner Cable Inc., MB Docket No. 10-71, at 2 (filed July 24, 2014) (J.A.

___).  They challenged, among other things, broadcasters' use of sharing

agreements.  *See, e.g.*, Notice of *Ex Parte* Presentation of American Cable

Association, Time Warner Cable, DISH Network, DirecTV, MB Docket No.

10-71, at 3 (filed November 21, 2012) (J.A. ___).  Broadcasters have used

---

[4] *Id.* at 7-8 (J.A. ___).

various forms of sharing agreements for many years to gain economies of scale that are permissible under competition law but cannot be achieved through outright ownership because of the FCC's restrictive broadcast ownership rules.  Through these agreements, weaker stations pair with stronger stations through a variety of contractual arrangements that provide benefits of scale while still respecting the strictures of the FCC's ownership rules.  *See Submission for the Record of the National Association of Broadcasters*, MB Docket No. 10-71, at 22-24 (filed March 24, 2014) (J.A. ___).  This most often occurs in medium and smaller sized markets, where a relatively large number of stations compete for a relatively small amount of revenue.  *Id. at* 24 (J.A. ___).

Although the specifics differ, it is typical for one station to provide services including billing, advertising sales, office management and accounting, engineering services, procurement, and often including negotiation of retransmission consent rights, to another local station through "joint sales agreements" ("JSAs") and "shared services agreements" ("SSAs").  *Retransmission NPRM* at ¶ 23 (J.A. ___).  Editorial discretion and programming decisions remain with the licensee.  *See Ex Parte* Communication of Sinclair Broadcast Group, MB Docket No. 10-71, at 2 (filed February 26, 2014) (J.A. ___); *In the Matter of 2014 Quadrennial*

11

*Regulatory Review*, MB Docket No. 14-50, FCC 14-28, at ¶ 325 (released April 15, 2014) (J.A. ___).

    The FCC has been aware of these sharing agreements since at least 1992 and has reviewed and approved of them in connection with mergers and acquisitions.[5]  Numerous transactions including these types of agreements have also been reviewed by the Department of Justice ("DOJ") under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 (1976) (J.A. ___), and were allowed to go into effect without objection under traditional antitrust principles in which the competitive benefits and detriments of a proposed transaction were fully weighed.  *See Ex Parte* Communication of Sinclair Broadcast Group, MB

---

[5] *See, e.g., Broadcast Station Time Brokerage Survey Completed*, Public Notice, 7 FCC Rcd 1658 (Mass Med. Bur. 1992) (J.A. ___) (noting that "the use of . . . LMA arrangements appears often to be associated with efforts to sustain the operations of stations facing economic difficulties.").  The Commission has previously approved applications for consent to television station transactions involving a combination of joint sales agreements, other types of shared services agreements, options and similar contingent interests, and guarantees of third-party debt financing, and has found these cooperative arrangements not to rise to the level of an attributable interest. *See, e.g., Malara Broadcasting Group of Duluth Licensee LLC*, 19 FCC Rcd 24070 (2004) (J.A. ___);  *Sagamore Hill of Corpus Christi Licenses, LLC,* 25 FCC Rcd 2809 (2010) (J.A. ___); *Piedmont Television of Springfield License LLC*, 22 FCC Rcd 13910 (2007) (J.A. ___); *Chelsey Broadcasting Company of Youngstown, LLC*, Letter, 22 FCC Rcd 13905 (2007) (J.A. ___);  *Shareholders of Ackerley Group, Inc.*, Memorandum Opinion and Order, 17 FCC Rcd 10828, 10841 (2002) (J.A. ___).

12

Docket No. 10-71, at 2 (filed February 26, 2014) (J.A. ___) (describing

approval under Hart-Scott-Rodino review).  The DOJ likewise entered into a

consent decree and the FCC approved applications permitting the closing of

a transaction worth two billion dollars that included use of sharing

agreements.  *See Applications for Consent to Transfer of Control from*

*Shareholders of Belo Corp. to Gannett Co. Inc.*, MB Docket No. 13-189, 28

FCC Rcd 16867, 16880 ¶ 33 (Med. Bur. 2013) (J.A. ___)..

   Notwithstanding the lack of any bad faith finding on the part of

broadcasters and the approval of the above described transactions, the

*Retransmission Order* makes it a *per se* violation of the good faith

negotiation requirement for two non-commonly-owned "Top-Four"

television stations (based on audience share) to jointly negotiate

retransmission consent or coordinate their retransmission consent

negotiations.[6]  *Retransmission Order* at ¶ 1 (J.A. ___).  In contrast to the

*Retransmission NPRM*'s goal of protecting consumers from "blackouts" and

limiting retransmission "impasses," ¶ 26 (J.A. ___), the *Retransmission*

*Order* announces the very different goal of reducing broadcasters'

---

[6] Whether a station is not commonly owned is determined based on the
Commission's broadcast attribution rules.  47 C.F.R.
§76.65(b)(1)(viii)(B)(1).

13

bargaining leverage and preventing "increases in retransmission consent fees" through the prohibition on joint negotiations.  *Retransmission Order* at ¶ 17 (J.A. ___).

## SUMMARY OF ARGUMENT

The FCC has never found that a broadcaster violated its duty to negotiate in good faith, and the *Retransmission NPRM* acknowledges that "very few complaints" alleging failure to negotiate in good faith have ever been filed on any grounds.  *See Retransmission NPRM* at ¶ 12 (J.A. ___).

Nonetheless, the *Retransmission Order* reads as if the FCC must adopt a new *per se* rule to prohibit widespread "collusion" and illegal "price-fixing" amounting to bad faith negotiations by broadcast stations.   ¶ 37 (J.A. ___).  If these things were occurring and were proper matters for FCC review, there should be a long history of decisions consistently finding that joint negotiation consistently fails the FCC's "totality of the circumstances" good faith test.

The *Retransmission Order* does not acknowledge that these joint negotiations have been routinely and openly conducted pursuant to sharing agreements.  It does not acknowledge that the FCC has approved transactions involving more than a hundred sharing agreements over many years, or that the agreements exist because the FCC has never relaxed or

14

justified its local ownership rules as Congress intended  and as this Court long ago ordered the FCC to do.  *See Sinclair Broad. Grp., Inc. v. FCC*, 284 F.3d 148 (D. C. Cir. 2002).  Sinclair submits that the FCC's refusal to follow this Court's ruling in *Sinclair*, a related case and a directive more than ten years old, is yet another reason for this Court to give pause to the FCC's decision in the instant case.

The FCC now prohibits joint negotiations with a *per se* rule, when no joint negotiation has ever been found to constitute bad faith based on case-by-case review.  This is tantamount to using a chainsaw when there has been no showing that even a scalpel is needed.

*The FCC Lacks Authority to Adopt the Order.*  The *Retransmission Order* exceeds the FCC's authority in three ways.  First, the FCC has impermissibly and forcefully inserted itself into the marketplace for retransmission consent, deciding how bargaining power should be allocated among parties in private contractual agreements and drawing a bright-line, indiscriminate rule to curb the bargaining power of broadcasters and reduce the rates they receive from MVPDs.

Second, it imposed a non-reciprocal "bargaining" rule on broadcasters only.  Congress expressly required the FCC to impose a "reciprocal" good faith bargaining obligation on MVPDS and did so using exactly the same

15

language it used to direct the FCC to impose the good faith rule on

broadcasters. *See* SHVERA, § 207. The FCC does not have authority to

hold broadcasters and MVPDs to different standards of good faith in

retransmission negotiations.

Third, the new *per se* rule amounts to an unlawful restraint in

broadcasters' ability to alienate their retransmission consent rights.

Nevertheless, the FCC claims to find authority to pursue these goals

and to adopt the new rule "in Section 325(b)(3)(A) [which] directs the

Commission 'to establish regulations to govern the exercise by television

broadcast stations of the right to grant retransmission consent.'"

*Retransmission Order* at ¶ 30 (quoting 47 U.S.C. § 325(b)(3)(A)) (J.A. ___).

But, by the FCC's own admission, that section only directs the FCC to

promulgate rules to govern the process by which broadcasters choose

between retransmission consent and must carry status once every three

years.

The FCC also found "broad discretion" in 47 U.S.C. §

325(b)(3)(C)(ii), commonly referred to as the "good faith bargaining"

provision, which  instructs the FCC to "prohibit a television broadcast

station that provides retransmission consent from . . . failing to negotiate in

good faith." But that section only authorizes the FCC to adopt regulations to

16

ensure that a broadcaster enters into negotiations with the good faith

intention of reaching a deal.  The FCC has never before interpreted its

authority in a way that would permit adoption of the new *per se* rule.  It is

not a bargaining rule at all.  It is a substantive prohibition on market

structures and contractual arrangements intended to influence the outcome of

carriage negotiations, and is beyond the FCC's authority to adopt.

    *The Commission's action is arbitrary and capricious, an abuse of its*

*discretion and contrary to law.*  The Court should also set aside the FCC's

new rule under the Administrative Procedure Act ("APA") because the

*Retransmission Order* is "arbitrary, capricious, an abuse of discretion and

otherwise not in accordance with the law."[7]  The FCC has never found that a

broadcaster failed to negotiate in good faith, making the FCC's assertion that

a new *per se* rule is necessary to provide "certainty" and "administrative

efficiency" mere recitation of agency buzzwords.  *Retransmission Order* at ¶

12 (J.A. ___).  The *Retransmission Order* arbitrarily relies on

misconstructions of antitrust law to find that joint negotiations constitute *per*

*se* bad faith, when antitrust law would require analysis of the facts and

circumstances akin to the analysis the FCC would conduct under its "totality

---

[7] 5 U.S.C. § 706(2)(A).

of the circumstances" test.

The FCC has taken the simplistic approach that joint retransmission negotiations give broadcasters more bargaining power, and assumes this *per se* equates to excessive and anti-competitive power.  But that determination cannot be made on a *per se* basis.   For example, if two small stations, each with 10 percent of a local advertising market, and total annual revenues less than $50 million integrate operations and end up negotiating jointly with a large MVPD, which has annual earnings in the billions of dollars and a majority of local video subscribers, it cannot be rationally said that the two small stations enjoy an unfair negotiating advantage over the much larger MVPD.  Yet this is exactly the irrebuttable presumption adopted in the *Retransmission Order*.  It is for just this reason that the antitrust laws, on which the FCC bases its logic, are seldom applied to make activities *per se* unlawful.

The *Retransmission Order* arbitrarily reverses, without explanation, the FCC's own prior conclusions regarding the scope of its authority, the meaning of the good faith bargaining obligation and Congress' intent that the good faith bargaining obligations be reciprocal.  It was also arbitrary and capricious for the FCC to give decisional credit to a retransmission consent bargaining "model" that was admittedly based on a single "data point"

submitted into the record by a cable trade association, while failing even to

acknowledge substantial evidence to the contrary provided by others and by

not explaining its reasoning for doing so.  For these reasons, the Court

should vacate the FCC's new *per se* rule prohibiting joint retransmission

negotiations between broadcast television stations and MVPDs.

## STANDING

In order to establish standing to bring a direct appeal from an agency

action, a Petitioner must satisfy three elements:

> First, [Petitioner] must have suffered an injury in fact - an
> invasion of a legally protected interest which is (a) concrete and
> particularized; and (b) actual or imminent, not conjectural or
> hypothetical. Second, there must be a causal connection
> between the injury and the conduct complained of - the injury
> has to be fairly traceable to the challenged action of the
> defendant, and not the result of the independent action of some
> third party not before the court. Third, it must be likely, as
> opposed to merely speculative, that the injury will be redressed
> by a favorable decision.

*Weaver's Cove Energy, LLC v. Rhode Island Dep't of Envtl. Mgmt.,* 524

F.3d 1330, 1332-33 (D.C. Cir. 2008).  *See also Sierra Club v. EPA,* 292 F.3d

895 (D.C. Cir. 2002) (*accord*).  Petitioner Sinclair meets the requisite

standing requirements.  Sinclair is a publicly traded company that owns and

operates, programs, or provides sales services to more than 150 television

stations, after pending transactions.  As outlined in Sinclair's February 26,

2014 *ex parte* letter to the FCC, Sinclair uses joint retransmission consent

19

negotiations conducted pursuant to agreements providing for substantial integration of two stations' operations as a critical means "to secure fair, market-based financial sustainability for broadcast television." *Ex Parte* Communication of Sinclair Broadcast Group, Inc., MB Docket No. 10-71, at 3 (filed February 26, 2014) (J.A. ___).

In the proceeding below, Sinclair noted that "with respect to the great majority of households that Sinclair reaches … Sinclair [is] negotiating with a far larger company with vastly greater revenue, reach and market power than Sinclair, and which also sells local advertising in direct competition with Sinclair." *Id.* (J.A. ___). The record evidence in this case shows that joint retransmission consent agreements provide market efficiencies for broadcasters, such as Sinclair, that allow them to make reinvestments in their programming quality and capability.

If the FCC's new rule is not set aside, Sinclair will be directly harmed by its inability to realize the efficiencies of joint negotiations and will be placed at a further competitive disadvantage, resulting in direct economic injury to Sinclair. Setting aside the rule at issue will protect Sinclair from this imminent economic harm.

## ARGUMENT

## I.    THE FCC LACKS AUTHORITY TO ADOPT THE ORDER.

20

Section 706(2)(C) of the APA prohibits the FCC from adopting rules that exceed its statutory authority. "It is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by Congress." *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005). The "FCC, like other federal agencies, 'literally has no power to act ... unless and until Congress confers power upon it.'" *Id*. at 698 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986)).

The Commission's interpretation of its statutory authority involves a two part test asking first whether Congress has directly spoken to the issue. *AT&T Inc. v. FCC*, 452 F.3d 830, 835 (D.C. Cir. 2006) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837(1984)). If "Congress has directly spoken to the precise question at issue … [the Court] must give effect to [its] unambiguously expressed intent." *Id.* (citing *Chevron*, 467 U.S. at 842-43.).

Under step two, if "Congress has not directly addressed the precise question at issue," and the agency has acted pursuant to an express or implied delegation of authority, the agency's statutory interpretation is entitled to deference, as long as it is reasonable." *Am. Library Ass'n.*, 406 F.3d at 698-99.

21

But an agency's interpretation of a statute is not entitled to deference absent a delegation of authority from Congress to regulate in the areas at issue.  *See Ry. Labor Executives Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (*en banc*) (*Chevron* "deference is warranted only when Congress has left a gap for the agency to fill pursuant to an express or implied delegation of authority to the agency.'") (quoting *Chevron,* 467 U.S. at 843-44).

This Court has repeatedly taken action when an agency has issued rules beyond its statutory authority.  *See, e.g., AFGE, AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 35 (D.C. Cir. 2013) (holding that the government "lacked authority" to exclude certain unfair labor practice charges from the Federal Labor Relations Authority because "the clear definition of collective bargaining" obligated the agency to use that definition); *Emily's List v. FEC*, 581 F.3d 1, 49-51 (D.C. Cir. 2009) (holding that three regulatory provisions violate the Federal Election Campaign Act because they exceed the FEC's authority); *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 807 (D.C. Cir. 2002) (finding that the FCC acted without delegated authority from Congress).

As explained below, the FCC's attempt to regulate retransmission consent to reduce fees paid to broadcasters exceeds the authority granted to

22

the FCC by the plain language of the relevant statutes and is directly

contrary to the Congress' clearly stated intent in adopting those laws.  The

*Retransmission Order* states, without explanation, that the FCC has "broad

discretion" to regulate retransmission consent.  *Retransmission Order* at ¶ 31

(J.A. ___).   But that assertion of authority is not entitled to any deference

under the second part of the *Chevron* test.  *See Chevron*,467 U.S. at 842-43

("[I]f the intent of Congress is clear, that is the end of the matter; for the

court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress.").

A.     The FCC Does Not Have Authority to Try to Affect the
        Substantive Terms of Retransmission Agreements

Congress gave the FCC two specific and limited grants of authority

with respect to retransmission consent negotiations.  The 1992 Cable Act

gave the FCC authority to adopt rules governing a broadcaster's *choice*

between must carry and retransmission consent.  SHVIA and SHVERA gave

the FCC the authority to see that parties negotiate with a good faith intention

to reach agreement.  This is the extent of the authority Congress provided to

the FCC.

The FCC's purpose in adopting the new retransmission consent

regulation, however, is far broader than its limited authority: the FCC

expressly seeks to reduce the fees cable and other MVPDs pay to

23

broadcasters.  It does this by prohibiting otherwise legal market structures that broadcasters have used for many years in compliance with antitrust law to improve operational efficiency within the constraints of the FCC's ownership rules.

Congress did not authorize the FCC to regulate or manage bargaining power.  Congress created a "marketplace for the disposition of the rights to retransmit broadcast signals" but did not intend "to dictate the outcome of the ensuing marketplace negotiations."  S. Rep. No. 102-92 at 36 (J.A. ___). Congress intended the broadcasters' new right to be expansive and to rely on competition to the "maximum extent."  *Id.* at 70 (J.A. ___); *see also* 1992 Cable Act, § 3, 106 Stat. at 1463. (J.A. ___).  Congress "anticipat[ed] that the FCC [would] undertake to promulgate regulations which will permit the fullest application" of television stations' retransmission rights."  S. Rep. No. 102-92 at 38 (J.A. ___).  Although the FCC asserts that the fees it is attempting to reduce are "supra-competitive," Congress did not give the FCC authority to make any judgment regarding the level of payments broadcasters might negotiate.

The good faith bargaining provision adopted as part of SHVIA did not change the basic purpose of the 1992 Act.  *Good Faith Bargaining Order* at ¶ 40 (J.A. ___).  It merely granted the FCC narrow authority to prohibit

24

broadcasters from entering into exclusive agreements as between cable and satellite MVPDs and require good faith bargaining by all parties.  Congress did not intend for the good faith provisions to "subject the prices or other terms and conditions of non-exclusive retransmission consent agreements to [Commission] scrutiny."  145 Cong. Rec. H 2320 (daily ed. April 27, 1999) (colloquy between Representatives Tauzin and Dingell) (J.A. ___).  Until the *Retransmission Order*, the FCC itself understood that the good faith provisions gave it only "narrow" authority.  *Good Faith Bargaining Order* at ¶ 24 (J.A. ___).

The *Retransmission Order* turns the purpose of the statute on its head.  Congress intended to create a free market for negotiations, specifically to correct an imbalance that favored MVPDs.  Yet the new rule is contrary to express Congressional intent and is unfairly and impermissibly tips the balance in favor of MVPDs to *enhance* their market power of by restricting broadcasters' ability to enjoy the "fullest application" of their retransmission rights, as Congress intended.  Such tampering with the outcome of negotiations is contrary to the FCC's previous expressions regarding its authority.  *See, e.g.*, *EchoStar Satellite Corp. v. Young Broad., Inc., et al.*, 16 FCC Rcd 15070, ¶ 30 (2001) (J.A. ___) ("We find the back-and-forth exchange exhibited between EchoStar and Young regarding carriage terms

25

and conditions to be . . . precisely the judgment that Congress generally intended the parties to resolve through their own interactions and through the efforts of each to advance its own economic self-interest."); *In the Matter of Mediacom Comm'ns Corp. v. Sinclair Broad. Grp., Inc.*, 22 FCC Rcd 47, ¶ 18 (2007) (J.A. ___) ("seeking compensation commensurate with that paid to other programmers of equal, or lower, ratings is not *per se* inconsistent with competitive marketplace considerations").  The FCC's actions were never authorized by Congress and are outside the scope of the agency's authority.

1.    Section 325(b)(3)(A) Gives the FCC Only Narrow Authority to Establish Rules for Broadcasters to Choose Between Must Carry and Retransmission Consent

The FCC asserts that it has authority to impose the rule under Section 325(b)(3)(A) of the Communications Act, which, as the Commission puts it, directs the Commission "to establish regulations to govern the exercise by television broadcast stations of the right to grant retransmission consent." *Retransmission Order* at ¶ 30 (J.A. ___).  The Commission concludes without discussion or analysis that this short excerpt of a single sentence in one provision of the 1992 Cable Act vests the FCC with broad "authority to adopt rules governing retransmission consent negotiations, including the rule barring joint negotiations we adopt in this order." *Id.* (J.A. ___).  But that

26

conclusory statement begs the question of *how* that language vests the FCC
with such broad authority.

The short answer is that it does not.  A full quote of the relevant text
of Section 325(b)(3)(A) makes the meaning perfectly clear.  The statute
requires the FCC to "commence a rulemaking proceeding to establish
regulations to govern the exercise by television broadcast stations of the
right to grant retransmission consent under this subsection and of the right to
[must carry] signal carriage under section 534 of this title …."  47 U.S.C. §
325(b)(3)(A).  The purpose of Subsection 325(b)(3)(A) is very different
from and far more mundane than what the *Retransmission Order* asserts.  As
the FCC has acknowledged, it merely instructs the Commission to adopt
*procedures* for broadcasters to *exercise* their rights to either retransmission
consent status or must carry status.  As these were new rights, the 1992
Cable Act required stations to choose which rights to assert initially and then
to make new elections every three years.  The subsection immediately
following makes this clear.  Subsection 325(b)(3)(B) provides that "[t]he
regulations required by subparagraph (A) shall require that television
stations, within one year after [the date of enactment], and every three years
thereafter, make an election between the right to grant retransmission
consent under this subsection and the right to [must carry] under section

27

614."  47 U.S.C. § 325(b)(3)(B).  The legislative history also makes abundantly clear that Subsection 325(b)(3)(B) addresses the procedures for stations to assert either must carry or retransmission status and does not suggest any further purpose.  S. Rep. No. 102-92, at 37 (J.A. ___) ("Section 325 makes clear that a station electing to exercise retransmission consent with respect to a particular cable system will thereby give up its rights to signal carriage").

By the FCC's logic, if Section 325(b)(3)(A) gives the FCC "broad discretion" to generally regulate retransmission consent (as opposed to the *election* of retransmission consent), then the same subsection would necessarily also grant the FCC broad discretion to generally regulate must-carry status (as opposed to the *election* of must carry status).  *Retransmission Order* at ¶ 31 (J.A. ___).  But the Commission has always acknowledged that the 1992 Act "gives the Commission minimal discretion in implementing the general must-carry obligation provisions."  *1993 Implementation Order* at ¶ 27 (J.A. ___).  The FCC cannot have "broad discretion" to regulate retransmission consent under Subsection 325(b)(3)(A) if it has "minimal discretion" to regulate must carry.

The FCC's disingenuous new finding of broad, general regulatory authority over retransmission consent conflicts with the unambiguous text of

28

the statute and is not entitled to any deference. *Chevron*, 467 U.S. at 842-43.

As the Supreme Court has observed, Congress "does not . . . hide elephants

in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468

(2001); *see also Good Faith Order* at ¶ 23 (J.A. ___) ("when Congress

intends the Commission to directly insert itself in the marketplace for video

programming, it does so with specificity."). Moreover, even if 325(b)(3)(A)

did grant the FCC general regulatory authority over retransmission consent,

that authority would have to be used in a manner consistent with the express

intent of Congress as reflected in the 1992 Cable Act.

> 2.     Section 325(b)(3)(C)(ii) Gives the FCC Authority Only
>        to Ensure that the Broadcasters Come to the Bargaining
>        Table with a Good Faith Intent to Negotiate and Not
>        Discriminate Unreasonably Between Cable and Satellite
>        MVPDs

The FCC also asserted independent statutory authority to prohibit

joint negotiations under Section 325(b)(3)(C)(ii), the so-called "good faith

bargaining" provision, which was enacted in 1999. *Retransmission Order* at

¶ 6 (J.A. ___). Again, the FCC took the statutory language completely out

of context in a strained attempt to stretch it into authority that Congress

never granted and the FCC never saw until now.

Section 325(b)(3)(C)(ii) has two parts. First, it directs the FCC to

adopt rules requiring broadcasters to negotiate in good faith – "[to] develop

and enforce a *process* that ensures that broadcasters and MVPDs meet to negotiate retransmission consent and that such negotiations are conducted in an atmosphere of honesty, purpose and clarity of process." *Good Faith Order at* ¶ 24 (J.A. ___) (emphasis added). Second, it prohibits the FCC from finding that seeking different or discriminatory terms from different MVPDs constitutes bad faith *unless* those different terms are not based on competitive marketplace considerations. *Id.* at ¶ 23 (J.A. ___).

This is a very narrow grant of authority. The reference to "competitive marketplace conditions" is limited to an evaluation of whether different terms in agreements with different MVPDs violate the good faith obligation. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114-15 (2001) (under "the maxim [of] *ejusdem generis* . . . where general words follow specific words in statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (internal citation omitted). Under this principle of statutory construction, the FCC may not claim broad authority to regulate a "competitive marketplace." It may only say that different terms in different agreements are bad faith if they are not based on "competitive marketplace" conditions.

The *Retransmission Order* goes far beyond this, creating a blanket

30

prohibition on joint negotiations regardless of the intent of broadcasters to

reach an agreement or whether such negotiations result in different terms for

different MVPDs – or even whether the joint negotiations are otherwise

permitted under antitrust competition law.  *See Retransmission Order* at ¶ 13

(J.A. ___).  Congress has not permitted the FCC to take the extreme action

of managing negotiating leverage by prohibiting broadcasters (or MVPDs)

from utilizing otherwise legal commercial agreements and market structures.

The FCC's attempt to limit retransmission fees is especially problematic,

since permitting broadcasters to seek and obtain cash payments in order to

better compete with cable systems was one of the central underpinnings

resulting in Congressional adoption of the 1992 Cable Act.  *See* 1992 Cable

Act, § 2(a)(10), 106 Stat. at 1461 ("A primary objective and benefit of our

Nation's system of regulation of television broadcasting is the local

origination of programming.  There is a substantial governmental interest in

ensuring its continuation").

     C.    <u>The Commission Has No Authority to Impose a Limitation on
Broadcasters Only</u>

Until the *Retransmission Order*, the good faith standards were

reciprocal, as Congress intended.  The original seven *per se* standards

applied equally to broadcasters and MVPDs, and each describes objective

conduct that is inconsistent with a good faith intention to reach an

31

agreement.  *Reciprocal Bargaining Order* at ¶¶ 1, 8 (J.A. ___).  The

*Retransmission Order* changes that construct by adopting a market-skewing

eighth *per se* standard specifically intended to reduce the fees broadcasters

can negotiate, and then applies that rule to broadcasters only.

This directly contravenes Congress' intent in adopting the reciprocal

bargaining obligation.  When Congress imposed a good faith bargaining

obligation on MVPDs in 2004 in Section 207 of SHVERA, Congress used

the identical language it had used five years earlier in applying the good

faith bargaining obligation to broadcasters.  The legislative history makes

clear that Congress intended "the MVPD good-faith obligations to be

analogous to those that apply to broadcasters."  *Reciprocal Bargaining

Order* at ¶ 15.  It is presumed that Congress acts with knowledge of the

existing regulatory framework when it enacts new legislation, including

when the new law incorporates the language of the prior law.  *See Lorillard

v. Pons*, 434 U.S. 575, 580-81 (1978) ("Congress is presumed to be aware of

an administrative or judicial interpretation of a statute and to adopt that

interpretation when it re-enacts a statute without change.") (citations

omitted)); *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When

administrative and judicial interpretations have settled the meaning of an

existing statutory provision, repetition of the same language in a new statute

indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well").  And in implementing Section 207 of SHVERA, the Commission concluded, without equivocation, that Congress did not intend for the FCC to make substantive changes to its good faith rules.  *Reciprocal Bargaining Order* at ¶¶ 1, 8 (J.A. ___).  But that is precisely what the Commission did in this case.

The *Retransmission Order* ads an entirely new purpose to the good faith obligation – curbing negotiating leverage – and applies it only to broadcasters.  MVPDs routinely hire the same bargaining agent to represent MVPDs located in the same market to negotiate with broadcast stations in that DMA.  *See* Comments of the NBC Television Affiliates, MB Docket No. 10-71, at 18 (filed May 27, 2011) (J.A. ___).  In contrast, Top Four broadcast stations are now prohibited from using a "common third party" to negotiate retransmission consent terms – apparently barring a broadcaster from using the same law firm, consultant or other third party bargaining agent with as any other Top Four station in the same market, even if there is no collusion involved at all.  *See* 47 C.F.R. §76.65(b)(1)(viii)(B)(1).  Thus, MVPDs, which are not subject to FCC rules restricting their ownership, may use market structures that result in one MVPD negotiating on behalf of another MVPD that is not commonly owned, while broadcasters, which are

33

subject to highly restrictive FCC ownership limits, are prohibited from doing the same thing.  Congress did not authorize the FCC to apply fundamentally different rules to broadcasters and MVPDs.

D.    The FCC Does Not Have Authority to Limit Broadcasters' Freedom to Alienate their Retransmission Rights

In its first order implementing the must carry/retransmission consent election procedure the FCC recognized retransmission consent as "a separate right" that can be "bargained away" to third parties.  *1993 Implementation Order* at 173 (J.A. ___).  And the *Good Faith Order* specifically found that bargaining proposals by one station, *conditioned on carriage of another station in the same market*, to presumptively be consistent with competitive marketplace considerations.  *Good Faith Order* at ¶ 56 (J.A. ___).

The *Retransmission Order* exceeds the FCC's authority by imposing a direct restraint on alienation:  one Top Four broadcaster cannot sell, assign or delegate its right to retransmission consent to a party that holds retransmission rights to another Top Four broadcaster in the same market.  ¶ 37 (J.A. ___).[8]

---

[8] The *Retransmission Order* argues that the FCC's prior decision regarding carriage of another station in the same market might have referred to another commonly owned station.  ¶¶ 11-13 (J.A. ___).  But that is belied by the fact that the FCC has reviewed and approved many "sharing agreements" that provided for one station to negotiate retransmission rights of another station

Even if the FCC has authority to regulate retransmission consent, the new broadcaster-only good faith rule is not a reasonable exercise of that authority, and therefore fails the second part of the *Chevron* test.

## II.     THE RULE THAT JOINT NEGOTIATION IS *PER SE* BAD FAITH IS ARBITRARY AND CAPRICIOUS

The APA, 5 U.S.C. § 706(2)(A), directs reviewing courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *See AT&T Inc. v. FCC*, 452 F.3d 830, 835 (D.C. Cir. 2006); s*ee also Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).  Ordinarily, "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (U.S. 1983).  Moreover, "[t]he reviewing court should not attempt itself to make up for such deficiencies; [it] may not supply a reasoned basis for the agency's action that the agency itself has not given.  *Id.*

---

that was not commonly owned.  *Ex Parte* Submission of Broadcast Licensees, MB Docket No. 10-71, at 7 (filed March 17, 2014) (J.A. ___).

This Court has recently struck down agency action on the grounds that it is arbitrary and capricious in violation of Section 706(2)(A) of the APA. *See, e.g., BNSF Ry. Co. v. Surface Transp. Bd.*, 741 F.3d 163, 167 (D.C. Cir. 2014) (noting that the arbitrary and capricious standard "does not create a rubberstamp" for this Court to approve agency actions); *Indiana Boxcar Corp. v. RRB*, 712 F.3d 590, 591 (D.C. Cir. 2013) (vacating agency's decision as being arbitrary and capricious because the agency "did not adhere to [its] precedent and did not reasonably explain and justify its deviation from its precedent"); *Rapoport v. SEC*, 682 F.3d 98, 99, 106 (D.C. Cir. 2012) (vacating the SEC's order as arbitrary because "the Commission has not provided a consistent interpretation of the Rule nor justified the apparent inconsistency of its application . . . and may not depart from its precedent without offering a reasoned explanation"); *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (holding that the SEC "acted arbitrarily and capriciously" by not following its statutory mandate to "adequately assess the economic effects of a new rule"); *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (holding that EPA action was arbitrary and capricious because the EPA "[b]as[ed] its decision on a premise the agency itself has already planned to disrupt" rather than adhered to its obligation "to examine the relevant data and articulate a satisfactory

explanation for its action[s]").

There are multiple independent justifications for holding the FCC's *Retransmission Order* to be arbitrary and capricious.  We will address them in turn.

### A.  It is Arbitrary and Capricious to Adopt a *Per Se* Standard When No Broadcaster Has Ever Been Found To Have Negotiated In Bad Faith

To read the *Retransmission Order* without knowing more one might naturally assume that the FCC has been receiving a steady flow of good faith complaints alleging that joint negotiation of Top Four stations constitutes a failure to negotiate in good faith.  After all, the *Retransmission Order* asserts that it has the power to resolve such complaints under its existing "totality of the circumstances" test.  *Retransmission Order* at ¶ 33 (J.A. ___).[9]  One would naturally also assume that after considering the facts and circumstances of each complaint the FCC has consistently found that Top Four joint negotiations constitutes bad faith regardless of other circumstances.

But that has never happened:  no broadcaster has *ever* been found to

---

[9] For the sake of argument, we assume that the FCC has authority to find that joint negotiations constitute "bad faith" because of the impact on prices generally (and absent a failure of process or a showing of discriminatory terms between MVPDs).

have negotiated in bad faith, based on joint negotiations or for any other reason. *See Retransmission NPRM* at ¶ 12 (J.A. ___). In fact, few good faith complaints have even been filed, and in fourteen years, the only adverse finding was against an MVPD. *Id.* (J.A. ___).

Yet the Commission has now decided that a *per se* rule will be "more effective" and "administratively efficient" than case-by-case adjudication. *Retransmission Order* at ¶ 12. But there is nothing "effective" or "efficient" about adopting a *per se* rule to expedite complaint resolution by prohibiting agreements the FCC itself has approved and that have never been found to lead to a failure to negotiate in good faith. *Per se* standards are supposed to identify conduct that amounts to bad faith in *all* circumstances. *Good Faith Order* at ¶ 31. The Supreme Court has limited application of *per se* antitrust rules to business conduct that courts have found "always or almost always" result in anticompetitive effects. *See Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 19-20 (1979). The new *per se* rule is both arbitrary and circular: joint negotiations, which have never before been found to violate good faith based on specific facts and circumstances, now always constitute bad faith simply because the FCC has adopted a *per se* rule proscribing them.

B.     It is Arbitrary and Capricious for the FCC to Rely on Antitrust Law to Conclude that Joint Negotiations are *Per Se* Violations

38

of the Good Faith Bargaining Obligation When They Are Not
*Per Se* Illegal Under Antitrust Law.

Without explanation, the *Retransmission Order* abandons the FCC's

prior reliance on labor law's procedural construct as the basis for its good

faith bargaining rules and instead turns to substantive provisions of antitrust

law. This is both arbitrary and odd. Labor law, the FCC has recognized,

has a highly developed body of law defining what "good faith" bargaining

entails. *Good Faith Order* at ¶ 6, (J.A. ___). The *Retransmission Order*

does not identify any "good faith" principles in antitrust law, but it manages

to divine its own new good faith rule based on antitrust principles anyway.

In doing so, it grossly misapplies antitrust principles. It relies on

mistaken and simplistic notions of antitrust law to conclude that exercise and

negotiation of two Top Four stations' retransmission rights by a single party

is *per se* bad faith because it necessarily always leads to "supra-competitive

prices," even when such conduct is not *per se* illegal under antitrust law and

there is no evidence that such conduct actually has led to such results in the

past. Under antitrust law, *per se* rules of illegality are appropriate only when

they relate to conduct that is "manifestly anticompetitive" and lacks "any

redeeming virtue." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36,

49-50 (1977). But joint negotiations pursuant to above-the-board

agreements are not "manifestly anticompetitive."

39

The presumptive standard in evaluating the antitrust legality of such an agreement is the rule of reason. *See, e.g., Texaco, Inc. vs. Dagher*, 547 U.S. 1, 5 (2006). Even under the DOJ Competitor Collaboration Guidelines cited in the Commission's *Retransmission Order*, agreements between competitors that might otherwise be condemned as unlawful, such a naked price fixing, should be judged under a "rule of reason" where they are "reasonably related to, and reasonably necessary to achieve procompetitive benefits from, an efficiency-enhancing integration of economic activity." *See* Federal Trade Commission and U.S. Department of Justice, *Antitrust Guidelines for Collaborations Among Competitors* (April 2000) § 1.2 (J.A. ___). The rule of reason entails a flexible inquiry into the nature of the agreement and market conditions as needed to make "a sound determination of the overall competitive effect of the agreement." *Id.* (J.A. ___). Not surprisingly, "ordinarily, no one factor is dispositive in the analysis." *Id.* (J.A. ___).

The *Retransmission Order* treats *all* agreements that include joint negotiations of retransmission agreements between two Top Four stations as if they are naked "agreements not to compete or to fix prices." *See, e.g.*, ¶¶11, 38 (J.A. ___). But the FCC is plainly aware that many and perhaps all of the joint negotiations reflected in the record occurred pursuant to

40

agreements that involve substantial integration of station resources and

operations, since, as discussed, the FCC itself has reviewed and approved

many such agreements.  To the contrary, the purely structural approach of

the new rule – prohibiting all joint retransmission negotiations between any

two Top Four stations – is not only arbitrary and capricious but also at odds

with modern antitrust doctrine.[10]

Any actual cases involving anticompetitive actions through joint

retransmission negotiations can be addressed through case-specific

application of a rule of reason analysis.  But before taking action, the DOJ

would take into account the market power of the parties and any efficiencies

that might result from joint negotiations.  *See, e.g., Broad. Music, Inc.*, 441

---

[10] The government's own Collaboration Guidelines recognize that under
certain factual circumstances – which the FCC rule ignores – agreements
between competitors in the same market should be evaluated as a merger as
permitted if a merger would be permitted.  *Antitrust Guidelines* at §1.3 (J.A.
___).  The U.S. Department of Justice and Federal Trade Commission
*Horizontal Merger Guidelines* (2010) (J.A. ___) confirm, in turn, that
"merger analysis does not consist of uniform application of a single
methodology" and instead requires a "fact-specific analysis" utilizing a
"range of analytical tools" to evaluate the potential competitive effects of a
given transaction over a limited period of time.  *Id.* at 1 (J.A. ___).  High
market concentration and market shares between the merging parties is only
one of those factors and, at worst, creates a rebuttable presumption of
anticompetitive effects under both the *Merger Guidelines* and case law.
*Merger Guidelines* at §2.1, 2.13; *United States v. Baker Hughes, Inc.*, 908
F.2d 981, 982 (D.C. Cir. 1990).

41

U.S. 1 (1979).  History bears this out:  in its Hart-Scott-Rodino review of

proposed broadcast transactions, the Antitrust Division has sought

information regarding joint retransmission negotiations and has, after giving

consideration to the specific circumstances involved, not objected to such

transactions.  *See, e.g., Ex Parte* Communication of Sinclair Broadcast

Group, Inc., MB Docket No. 10-71 (filed February 26, 2014) (J.A. ___).[11]

But when the DOJ once found actual collusion in retransmission

negotiations devoid of any pro-competitive justification, it promptly took

action to stop such activities.  *US v. Tex. Television, Inc.* Civil Action No. C-

96-64, 1996 WL 859988 (S.D. Tex. Feb. 15 1996) (J.A. at ___).[12]

---

[11] The arbitrariness of the FCC rule is illustrated with a simple example. Imagine a hypothetical market in which the top four stations have shares of 45%, 18%, 11% and 9%, while the fifth ranked station has an 8% share. Under the FCC's *per se* standard stations ranked third and fourth, with a combined market share of 20%, would be *per se* prohibited from negotiating jointly – regardless of whether they achieve substantial efficiencies through integration – while stations ranked first and fifth, with a combined market share of 54% would not.  Indeed, absent extraordinary circumstances, a collaboration between the third and fourth ranked stations would fall within a DOJ/FTC general "safety zone."  *Collaboration Guidelines* § 4.2 (J.A. ___).

[12] According to a Government Accountability Office report to Congress, the companies in *US v. Texas Television, Inc*. were not involved in any other agreements, but if they had been, DOJ would have evaluated whether there were efficiencies derived from the agreements that would have balanced against the anticompetitive effects. *Media Ownership:  FCC Should Review the Effects of Broadcaster Agreements on Its Media Policy Goals*, GAO-14-558, at 23 (June 2014) (J.A. ___).

42

The direct result of the *Retransmission Order* is that all joint negotiations– including those implemented under agreements that the FCC itself previously approved – are now *per se* violations of the good faith rules. The FCC has thus perverted antitrust principles to find *per se* anticompetitive conduct where the DOJ and FTC never would and where the FCC never has.  The FCC's new *per se* rule imposes a market structure obligation on broadcasters that is both arbitrary and not rationally related to the purpose of the good faith obligation to ensure a fair process of bargaining.

C.  <u>The FCC's Conclusion that Joint Negotiations Leads to Supra-Competitive Prices is Unsupported by the Record and Ignores Evidence that Undermines Its Conclusion</u>.

The new rule restricting broadcasters' right to jointly negotiate is arbitrary and capricious because it is unsupported by and contrary to the record evidence.  The *Retransmission Order* finds that the rule is needed because "basic economic principles" allow it to "infer" that joint negotiations will lead to supra-competitive retransmission consent payments. *Retransmission Order* at ¶¶ 14-15 (J.A. ___).  To supposedly validate that theory, the *Retransmission Order* relies almost exclusively on a "model" submitted by an economist hired by a cable trade association, the "Rogerson Joint Control Analysis."  *Retransmission Order* at ¶¶ 14-15, 18, 20 and 27

43

(J.A. ___) (citing the model in the text and in footnotes).

The Rogerson model on which the FCC relies so heavily is based on a single "data point" which itself had no verifiable source. *Id.* at n.65 (J.A. ___). That "data point" was simply the statement of a cable operator filed in one of the very few good faith complaint proceedings that has ever occurred. The cable company asserted that it had examined its own retransmission agreements – which it did not make available to the FCC or the public – and determined that it paid rates 21.6% higher when a single entity negotiated for two Top Four stations. *Ex Parte* Comments of Suddenlink Communications in Support of Mediacom Communications Corporation's Retransmission Consent Complaint, MB Docket No. 10-71 (filed December 24, 2012) (J.A. ___). But that "data point" did not identify the markets involved, the relative market shares of the broadcasters involved in different negotiations, or the actual dollar amounts that were agreed to.

Armed solely with this "data point" and his theoretical model, Rogerson concludes that joint negotiation of retransmission consent "leads to price increases of at least 22%."[13] The author himself admits that his

---

[13] Letter from 25 Members of the American Cable Association to FCC Chairman Julius Genachowski, MB Docket Nos. 09-182, 10-71 (Feb. 4, 2013) (J.A. ___).

theoretical concept "does not prove that we would necessarily expect to find such a result"[14] and the FCC concedes that the single study is limited and that it is unwilling to wait for a more comprehensive analysis. *Id.* at n.65 (J.A. ___). The only other "evidence" the *Retransmission Order* relies on are conclusory assertions in comments of three cable operators that the retransmission fees they paid to Top Four stations that negotiated jointly were higher than those that were separately negotiated. *Id.* at n.66 (J.A. ___).

The *Retransmission Order* provides no context for the alleged price disparities in these isolated circumstances, and there is no data showing what rates "Top Four" stations command generally. So there is no basis to conclude that the rates in those cases were "supra-competitive," even if they were higher than the rates other stations negotiated. If the jointly negotiated Top Four stations in those cases were actually the top two stations, they might be expected to command higher fees than the third and fourth ranked stations, whether negotiated jointly or not.

In the context of a very large retransmission consent marketplace –

---

[14] Rogerson Joint Control Analysis at 11 (appended to Comments of American Cable Association, MB Docket No. 10-71 (filed May 18, 2010)) (J.A. ___).

hundreds of television stations negotiating with hundreds of MVPDs across many years – giving decisional credit to a single "data point" and three other assertions of "higher" rates is arbitrary and capricious on its face.

The record also includes extensive other evidence that MVPDs, rather than broadcasters, typically wield far greater bargaining leverage, but the FCC refuses to consider that evidence. *See, e.g., Retransmission Order* at ¶ 20 (J.A. ___); Sinclair Broadcast Group, Inc. Notice of *Ex Parte* Communications, MB Docket No. 10-71, at 3 (filed February 26, 2014) (describing challenges faced during negotiations) (J.A. ___).

The FCC disregards the fact that broadcasters typically negotiate retransmission consent against MVPDs that dwarf the broadcasters.[15] The top four MVPDs in this country serve 65% of all video homes, and the top

---

[15] For example, the *Retransmission Order* ignored evidence that MVPDs have gained leverage in local markets by pursuing a strategy of "clustering" their operations into specific regions where all or nearly all households receive service from the same operator. *See* Comments of the National Association of Broadcasters, MB Docket No. 10-71, May 27, 2011 at 28-29 (J.A. ___). While finding joint negotiations by two Top Four broadcast stations results in supra-competitive market power, the *Retransmission Order* ignored substantial, detailed, specific data showing high concentration of power by MVPDs in local markets, resulting in an erosion of broadcasters' leverage and causing broadcasters to accept less favorable terms than they otherwise would. *Id.* at 27-32, (citing, *inter alia*, SNL Kagan data and the Declaration of Jeffrey A. Eisenach and Kevin W. Caves (submitted with NAB's comments)) (J.A. ___).

10 serve almost 90% of such homes.[16]  *See Ex Parte* Communication of the

National Association of Broadcasters, MB Docket No. 10-71, at 6 n.20 (filed

March 24, 2014) (J.A. ___).  No television broadcast station group is

anywhere near the size of the largest MVPDs.  *See Ex Parte* Communication

of Sinclair Broadcast Group, Inc. MB Docket No. 10-71, at 3 (filed February

26, 2014) (J.A. ___).  The *Retransmission Order* ignores unrefuted evidence

that retransmission negotiations are conducted company-by-company, not

market-by-market, making it impossible to discern the impact of a Top Four

combination.  Among others, Sinclair explained that:

> when Sinclair negotiates with an MVPD, it is (with respect to
> the great majority of households Sinclair reaches) negotiating
> with a far larger company with vastly greater revenue, reach
> and market power than Sinclair . . . .  Any marginal benefit a
> broadcaster may have in one market is countered by significant
> bargaining disadvantages in most of the other markets being
> negotiated as part of the same transaction, where the MVPDs
> control large market shares.

*See* Sinclair Broadcast Group, Inc. Notice of *Ex Parte* Communications, MB

Docket No. 10-71, at 3 (filed February 26, 2014) (J.A. ___).  Evidence from

recognized market research firm SNL Kagan reflects this imbalance,

showing that retransmission fees are still well below levels MVPDs pay for

---

[16] This is also shown in the market capitalization of some of the MVPDs:
Comcast Corporation, $136B; Time Warner Cable, $39.5B and DirecTV,
$42 B.  *See* Comments of Sinclair Broadcast Group, Inc., MB Docket No.
10-71, 7 n.10 (filed June 26, 2014) (J.A. ___).

far less popular programming.[17]  But the FCC disregards this objective data that reflects actual market research.

Sinclair has explained that local sharing agreements at issue in this proceeding exist only because the FCC's strict ownership rules prohibit mergers that would otherwise be consistent with antitrust law.  Eighteen years ago Congress ordered the FCC periodically to review the state of competition in the television market and eliminate broadcast ownership rules it cannot justify to be necessary in the public interest.  Telecommunications Act of 1996, Section 202(h) (J.A. ___).  This court has construed Section 202(h) to carry a presumption of deregulation and has twice remanded FCC decisions to retain ownership rules as arbitrary and capricious.  *See, e.g.*, *Sinclair Broad. Grp., Inc.*, 284 F.3d 148 (remanding decision to retain the local ownership rule); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027 (D.C. Cir. 2002) (remanding decision to retain the national ownership cap).[18]

---

[17] *Ex Parte* Letter from Rebecca Hanson, SVP of Strategy and Policy for Sinclair to Marlene Dortch, MB Docket 10-71 (filed February 26, 2014) (J.A. ___).  SNL Kagan's report showed that, while almost 40% of television viewing is of broadcast signals, broadcasters received only 9.5% of basic cable fees in 2013 and those fees were projected to grow at less than 1% of basic cable fees each year, to only 12% in 2016.

[18] Rather than directly address the remand ordered by the FCC in Sinclair v. FCC, the FCC conducted a new Biennial Review.  *See 2002 Biennial Regulatory Review*, Report and Order and Notice of Proposed Rulemaking,

Nevertheless, fourteen years after the *Sinclair* remand, and after completion of several periodic reviews, the FCC still prohibits broadcasters from owning two stations in most television markets under the local ownership rule this court remanded in *Sinclair*.[19]  The television market today is vastly

---

18 FCC Rcd 13260 at ¶ 134 (2002), ("*2002 Biennial Order*") (J.A. ___).  In its *2002 Biennial Order*, the Commission eliminated the eight voices standard entirely.  It modified the local television ownership rule to permit television station triopolies in markets with 18 or more television stations and television station duopolies in markets with 17 or fewer television stations.  The Commission concluded that "in light of the myriad sources of competition to local television broadcast stations . . . our current rule is not necessary in the public interest to promote competition . . . [and] does not promote, and may even hinder, program diversity and localism" yet left in place the limitation that a single company may not own more than one top-four station in a market.  *Id.* at ¶ 133 (J.A. ___). On appeal, the  United States Court of Appeals for the Third Circuit stayed the effectiveness of the 2003 Rules, ultimately holding, *inter alia*, that the Commission had failed to adequately support its new local television numerical limits, and remanded the matter for further agency consideration.  *Prometheus Radio Project v. FCC*, 373 F. 3d 372 (3d Cir. 2004).  In July 2006, the FCC initiated the 2006 Quadrennial Regulatory Review under Section 202(h) of the Communications Act, seeking comment on, among other things, how to address the issues raised by the Third Circuit's decision.  As a result, the FCC adopted an order containing ownership rules that re-adopted the 1999 Rules.  *Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010 (released February 4, 2008) (J.A. ___).  This was upheld in part in *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011).

[19] Within a month of the release of the *Retransmission Order*, the FCC terminated its latest review of the local broadcast ownership rules pursuant to Section 202(h) of the 1996 Act.  Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of

more competitive than it was in 2002, when this Court determined that the FCC had failed to justify retention of the local ownership rule that is still on the books today.

Although the FCC asserts in the *Retransmission Order* that it has enough data to "confidently conclude that the harms from joint negotiation outstrip any efficiency benefits," *Retransmission Order* at ¶ 10 (J.A. ___), the United States Government Accountability Office ("GAO") has recently found just the opposite.  In a June 2014 report on broadcaster sharing agreements the GAO cited the FCC's own conclusion that it "lacked information about the scope and prevalence of broadcaster agreements and, thus, could not conduct a thorough analysis of the impact of the agreements on its rules and policy goals."  *Media Ownership: FCC Should Review the Effects of Broadcaster Agreements on Its Media Policy Goals*, GAO-14-558, at 27 (June 2014) (J.A. ___).  The GAO states that the FCC has not collected data or completed a review "to understand how broadcaster agreements are

---

1996, MB Docket No. 14-50 (released April 15, 2014) (J.A. ___)  In that proceeding, after five years of study and with a voluminous record, the FCC was unable to make *any* decisions about the necessity of the broadcast ownership rules.  *Id.* at ¶ 6 (J.A. ___).  In contrast, here the FCC found enough confidence in a study based on "only one data point" to "confidently conclude" that it should prohibit Top Four joint negotiations.  *Retransmission Order* at ¶ 16 n. 65 and ¶ 10 (J.A. ___).

being used" or to "determine the number of agreements, the services

provided through the agreements, and other relevant data to provide useful

context, such as market and station characteristics associated with the use of

agreements." *Id.* at 27-28 (J.A. ___).  The report strongly implies that the

FCC's data on broadcaster agreements does not meet "federal standards for

internal control" in decisionmaking. *Id.* (J.A. ___).  The GAO noted that

"restrictions on local television station ownership have remained largely

unchanged since 1999 . . . [while] the media marketplace is rapidly evolving

and offering consumers a variety of platforms for receiving information and

programming [leading to] increased competition between broadcast stations

and other media platforms . . . ." *Id.* at 28-29 (J.A. ___).

Notably, the GAO report was issued three months after the FCC

adopted the *Retransmission Order.* This means that the FCC "confidently"

adopted the new *per se* rule to prohibit agreements, when it did not

understand the number, content or context of the agreements or their impact

on the FCC's policy goals and its data likely did not meet federal standards

for internal control.

D.      It is Arbitrary and Capricious for the FCC to Abandon Its Prior
        Determinations Regarding the Scope of Its Authority

The *Retransmission Order* also changes the FCC's position on

retransmission consent in several fundamental ways without adequate

51

explanation.  When the FCC changes its position on an issue it owes a

reasoned explanation for its action and must recognize that it is changing its

position   *See FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515-16 (U.S.

2009) ("To be sure, the requirement that an agency provide reasoned

explanation for its action would ordinarily demand that it display awareness

that it is changing position.  An agency may not, for example, depart from a

prior policy *sub silentio* or simply disregard rules that are still on the books.

And of course the agency must show that there are good reasons for the new

policy.").  Moreover, "when, for example, its new policy rests upon factual

findings that contradict those which underlay its prior policy; or when its

prior policy has engendered serious reliance interests that must be taken into

account . . .[i]t would be arbitrary or capricious to ignore such matters."  *Id.*

As such, "a reasoned explanation is needed for disregarding facts and

circumstances that underlay or were engendered by the prior policy."  *Id.*

   The *Retransmission Order* asserts, without explanation, that

"Congress has granted the Commission broad discretion to adopt rules

implementing Section 325, including rules defining the scope of the good

faith obligation."  *Retransmission Order* at ¶ 31 (J.A. ___).  This reverses

the FCC's prior conclusions, which were based on thorough analyses, that

both the legislative history and established principles of statutory

construction require a *narrow* construction of the good faith obligation, that
Congress did not intend for the FCC to intrude into the market, and that the
FCC does not have authority to engage in "substantive oversight" of
retransmission agreements. *Good Faith Order* at ¶¶ 6, 13, 20 (J.A. ___).
These two views of the FCC's discretion and authority are irreconcilable.
The *Retransmission Order* does not even acknowledge the inconsistency,
much less explain it.

     None of the original *per se* standards attempts to define or change the
market for retransmission consent, alter or prohibit otherwise legal market
structures, constrain broadcasters' ability to alienate their retransmission
rights, or limit any party's bargaining power for the purpose of affecting
carriage fees. They are, concise, clear, objective and reflect bad faith
behavior "in all possible instances." *Id.* at ¶ 31 (J.A. ___). The new eighth
*per se* standard differs markedly. It is not concise or objective, and it does
not reflect bad faith in all possible circumstances because many
circumstances could and do exist in which joint negotiations do not result in
excessive market power.

     The FCC has radically changed its course here, and it is obliged "to
supply a reasoned analysis indicating that prior policies and standards are
being deliberately changed, not casually ignored." *Greater Boston*

*Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).  This Court in

*Action for Children's Television v. FCC*, 821 F.2d 741, 746 (D.C. Cir.

1987), determined that the FCC's "barebones incantation of two abbreviated

rationales" were not sufficient for changing its long-established policy on

children's television.  In that case, the FCC had not provided any facts or

analysis supporting its decision that "its earlier concerns over market failure

[with regard to children's television] were overemphasized, misguided,

outdated or just downright incorrect."  *Id.*

Here, the FCC gives no explanation at all for abandoning its prior

interpretations of its own authority and does not even acknowledge that it

has changed positions.  Absent acknowledgement of and a rational

explanation for the change, the new regulation adopted pursuant to the

newly found broad discretion is arbitrary and capricious.  *See, e.g.*, *Verizon*

*Telephone Cos. v. FCC*, 570 F.3d 294, 304 (D.C. Cir. 2009) ("[I]t is

arbitrary and capricious for the FCC to apply such new approaches without

providing a satisfactory explanation when it has not followed such

approaches in the past . . ."); *Conn. Light & Power Co. v. Nuclear*

*Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982) (" [the agency]

should explain the general bases for the rules chosen . . [and d]isclosure of

the agency's rationale is particularly important in order that a reviewing

54

court may fulfill its statutory obligation to determine whether the agency's choice of rules was arbitrary or capricious").

The arbitrary nature and capriciousness of the FCC's new rule is perhaps best illustrated by the radical shift in rationale between the *Retransmission NPRM* and the *Retransmission Order*.  The goal of the *Retransmission NPRM* was "to protect consumers from the disruptive impact of the loss of broadcast programming carried on MVPD video services . . . when broadcasters and MVPDs fail to reach an agreement to extend or renew their retransmission consent contracts." *Retransmission NPRM* at ¶ 17 (J.A. ___).  Yet the *Retransmission Order* uses the same proposed rule to solve a different problem that is not even identified as a matter of concern in the NPRM:  "supra-competitive" retransmission fees that harm MVPDs.  The *Retransmission Order* does not even mention loss of programming during negotiations as a matter of concern.  It is remarkable how precisely the same rule solves a completely different (and previously unidentified) problem than the one it was originally proposed to address.  *Cf. Conn. Light & Power Co.*, 673 F.2d at 530  ("If the notice of proposed rule-making fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals . . . [and t]o allow an agency to play hunt the

55

peanut . . . [and] hid[e] or disguis[e] the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport."); *see also MCI Telecomm'ns Corp. v. FCC,* 57 F.3d 1136, 1142 (D.C. Cir. 1995) ( "an agency may not turn the provision of notice into a bureaucratic game of hide and seek.")

## CONCLUSION AND RELIEF REQUESTED

The *Retransmission Order* is a solution looking for a problem.  It contravenes the FCC's statutory authority and was taken without any evidence of anticompetitive actions or actual bad faith.  If there were actual anticompetitive effects, the proper authority lies with the experts at the Antitrust Division of the Department of Justice, and if there were bad faith, the FCC could rely on its already existing authority to under the "totality of circumstances" standard that is already in place.

For all of the above reasons, the Court should vacate the Commission's new Retransmission Consent Rules adopted in the *Retransmission Order*.  Determinations as to the competitive effects of joint negotiations by television stations with MVPDs for carriage of broadcast television signals should be left to the Department of Justice.  The FCC does not have authority to regulate competition in the retransmission market, and even if it did, the *Retransmission Order* is arbitrary and capricious.

56

404778345_1.DOCX

Dated:  September 16, 2014

Respectfully Submitted,

By: /S/ Thomas G. Allen_____
      Clifford M. Harrington
      Jay E. Silberg
      John K. Hane
      Paul A. Cicelski
      Thomas G. Allen
      **PILLSBURY WINTHROP SHAW PITTMAN LLP**

**Attorneys for Sinclair Broadcast Group, Inc.**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this final brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B)(i).

Exclusive of the exempted portions of the final brief, as provided in Fed. R. App. Proc. 32(a)(7)(B)(iii), the appellant's brief includes 12,664 words.

This brief has been prepared in proportionally space typeface using Microsoft Word '97 in Times New Roman font. As permitted by Fed. R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.

/s/ Thomas G. Allen
Thomas G. Allen